# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF MISSISSIPPI
# EASTERN DIVISION

**ROBERT J. JAMISON, ET AL**                                                                        **PLAINTIFFS**

**V.**                                            **CIVIL ACTION NO. 1:04cv366**

**TUPELO, MISSISSIPPI, ET AL**                                                   **DEFENDANTS**

## MEMORANDUM OPINION

On November 24, 2004, the plaintiffs in this action filed suit under Section 2 of the Voting Rights Act of 1965 (42 U.S.C. § 1973) and the Fourteenth and Fifteenth Amendments of the United States Constitution seeking declaratory and injunctive relief against Tupelo, Mississippi, alleging unlawful vote dilution. The court conducted a bench trial of this matter from October 10, 2006 through October 12, 2006. Pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, the court issues the following findings of fact and conclusions of law.

The City of Tupelo has been governed by the mayor-council form of government since 1993. In accordance with Miss. Code Ann. § 21-8-1 *et. seq.* (1972), Tupelo employs a hybrid election scheme, commonly known as the 7-2 hybrid system, in which seven city council members are elected from single member districts and two city council members are elected at large through citywide voting. The plaintiffs are seeking declaratory and injunctive relief to 1) enjoin further use of the 7-2 hybrid election method in Tupelo; 2) declare that the use of at-large citywide voting to elect two council members dilutes African American voting strength under Section 2 of the Voting Rights Act of 1965 and the Fourteenth and Fifteenth Amendments of the United States Constitution; and 3) adopt and implement a plan with nine single member districts.

The named plaintiffs in this action are African American adult residents and registered voters of the city of Tupelo, Mississippi. According to the 2000 census, the city of Tupelo has a total population of 34,211. The total voting age population is 24,807, of whom approximately 24.9% are African American. Under the present system there are two majority-minority wards in Tupelo, Wards 4 and 7. There is currently one African American on the Tupelo City Council, the Ward 4 representative. Ward 7 has not elected an African American in the four elections held since the city of Tupelo adopted the mayor-council form of government. No African American candidate has won a contested city-wide election in Tupelo for mayor or at large city council member. The city of Tupelo does not employ a candidate slating process and there are no prohibitions against single shot voting in the elections for at large seats.

## ANALYSIS

*Thornburg v. Gingles*, 106 U.S. 30, 106 S. Ct. 2752, 92 L.Ed.2d 25 (1986), states that the essence of a §2 claim is that certain electoral laws, practices, or structures interact with social and historical conditions to cause inequality in opportunities enjoyed by black and white voters to elect their preferred representatives. Violations of the Voting Rights Act (42 U.S.C. § 1973) are established when, based on the totality of the circumstances, it is shown that the political processes leading to nomination or election in the state or political subdivision are not equally open to participation by members of a class of citizens protected by § 2(a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. *Gingles*, 106 U.S. at 36. However, this does not require that members of a protected class be elected in numbers proportional to their proportion of the population. *Id*.

2

While the Supreme Court has recognized that multimember and at large election schemes operate to minimize voting strength of racial minorities, the schemes are not *per se* violations of minority voter rights. *Id.* at 47-48. In order to show that multimember, or in this case, at large, districts impair or dilute minority voting power, the minority group must show that it is 1) sufficiently large and geographically compact to constitute a majority in a single member district, 2) politically cohesive and 3) that the majority usually votes sufficiently as a bloc to defeat the minority's preferred candidate. *Gingles*, 106 U.S. at 50-51.

The Senate Judiciary Committee Majority Report accompanying the bill amending §2 is cited by the Supreme Court in *Thornburg v. Gingles* and notes typical objective factors that might be probative of a §2 violation. This non-comprehensive list includes 1) the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process; 2) the extent to which voting in the elections of the state or political subdivision is racially polarized; 3) the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single-shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group; 4) if there is a candidate slating process, whether the members of the minority group have been denied access to that process; 5) the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment, and health, which hinder their ability to participate effectively in the political process; 6) whether political campaigns have been characterized by overt or subtle racial appeals; and 7) the extent to which members of the minority group have been elected to public office in

the jurisdiction. *Id*. at 36-37. Another factor to consider is whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group. Also probative is whether the policy underlying the state or political subdivision's use of a voting qualification, prerequisite to voting, or standard, practice, or procedure is tenuous. *Id*. These factors are flexible and fact intensive. *Id.* at 46. See, *Boddie v. City of Cleveland*, 297 F. Supp. 2d 601 (N.D. Miss. 2004).

**First *Gingles* Precondition: Sufficiently Large and Compact**

The plaintiffs must demonstrate that the African American population in Tupelo is sufficiently large and compact to constitute a majority in a single member district. This precondition is meant to establish that a workable solution is possible. *See Houston v. Lafayette County,* 56 F.3d 606, 611 (5th Cir. 1995), *Bone Shirt v. Hazeltine*, 461 F.3d 1011, 1019 (8th Cir. 2006). The city of Tupelo presently has two majority-minority single member districts. The plaintiffs have presented two illustrative plans from expert William S. Cooper. Illustrative Plan A demonstrates that three majority African American wards can be created under a nine single member ward system while Illustrative Plan B maintains the two majority African American wards under a seven single member ward system while strengthening the African American voting age population in those wards. Illustrative Plan A created majority African American wards in Wards 1, 2, and 3. Ward 1 has a 57.79% African American voting age population, Ward 2 has a 56.95% African American voting age population, and Ward 3 has a 58.67% African American voting age population. The plan was designed so that the newly created Ward 3 encompasses the entirety of two existing neighborhood association zones. Illustrative Plan B is a seven ward plan that keeps Wards 4 and 7 as the majority African American districts while

shifting boundaries to create a 60.80% African American voting age population in Ward 4 and a 60.61% African American voting age population in Ward 7. The first *Gingles* precondition has been met since the plaintiffs have established that majority-minority districts can be created under a seven or nine member plan.

**<u>Second and Third *Gingles* Preconditions: Political Cohesion and Bloc Voting</u>**

The second *Gingles* precondition requires that the plaintiffs demonstrate that the African American community in the city of Tupelo is politically cohesive. The third *Gingles* precondition requires that the plaintiffs demonstrate that the majority typically votes in a bloc to defeat the minority candidate of choice. An inquiry into the existence of racially polarized voting aids in determining whether the second and third preconditions have been met. A showing that a significant number of minority group members usually vote for the same candidate is one way of proving the political cohesiveness necessary to a vote dilution claim and consequently establishes minority bloc voting within the context of §2. *Gingles*, 478 U.S. at 56, 106 S.Ct. at 2769. In general, a white bloc vote that normally will defeat the combined strength of minority support plus white "crossover" votes rises to the level of legally significant white bloc voting. *Id*. Endogenous and interracial elections are the best indicators of whether the majority usually defeats the minority candidate. *Bone Shirt*, 461 F.3d at 1020. The more recent an election, the higher its probative value. *Id*. Endogenous elections are elections in a single district which are held to elect that district's representatives. Exogenous elections are elections in a district for positions that are not exclusively representative of that district. While endogenous elections are more probative than exogenous elections, exogenous elections do hold some probative value. *Id.* at 1021.

5

Both the plaintiffs and defendants presented expert testimony on cohesiveness and bloc voting. The plaintiffs presented Dr. Allan J. Lichtman as an expert on racial bloc voting and socioeconomic analysis and the defendants presented Dr. Ronald Weber as an expert in Voting Rights Act redistricting, demographics, and drawing of wards.

Dr. Lichtman utilized bivariate ecological regression analysis, one of the methodologies that has been used by social scientists for years and is the methodology utilized in *Thornburg v. Gingles*. The defendant's expert, Dr. Ronald Weber, utilized the bivariate ecological regression analysis, extreme case analysis, and the King ecological inference methods in his report. Dr. Lichtman's initial report examined four endogenous elections for the at large seats on the Tupelo City Council and the socioeconomic circumstances of the citizens of Tupelo. His supplemental report analyzed the Lee County results in exogenous interracial elections from the 1990's through 2003. Dr. Weber's initial report examined the contested mayor, city council, and at-large elections from 1993 through 2005. Dr. Weber's supplemental report included analysis of exogenous elections held in the city of Tupelo that were discussed in Dr. Lichtman's supplemental report, exogenous contested judicial elections, and exogenous Democratic primary runoff elections and analysis of expert William S. Cooper's report.

Dr. Lichtman's preliminary report analyzed the endogenous at-large elections for the years 1993, 1997, 2001, and 2005. The report and Dr. Lichtman's explanation of the report demonstrates that African-American voters were cohesive in 1993, 1997, and 2001. African-American voters were cohesive in support of candidate Jamison in 1993 and candidate Penson in 1997 and 2001. In 1993, most of the other candidates did not receive any substantial vote from the African American community at all, with a white Democratic candidate receiving only a

6

marginal percentage of the vote from the African American community. In 1997 and 2001, it appears that the minority community engaged in single shot voting, an indicator of cohesiveness, as the other candidates in those elections received 0% of the African American vote. However, the African American candidate of choice was ranked last out of all candidates among non African American voters in the elections held in 1993, 1997, 2001, and 2005. Despite cohesive support from the African American community for particular candidates in 1993, 1997, and 2001, the white majority voted as a bloc for other candidates which caused the African American candidate of choice to be defeated.

The 2005 at-large council election was the only at-large election in which the African American community did not demonstrate political cohesiveness. The African American vote was closely divided. Notably, candidate Deas received more votes than African American candidate Neely in both majority African American wards. Despite this, Lichtman's results for the city as a whole showed that Neely was preferred only by a very narrow margin and support for candidates Deas and Johnson followed tightly behind. Although there was no political cohesion in this election, *Gingles* reminds us that "the fact that racially polarized voting is not present in one or a few individual elections does not necessarily negate the conclusion that the district experiences legally significant bloc voting." *Gingles*, 478 U.S. at 57. ". . . [A] pattern of racial bloc voting that extends over a period of time is more probative of a claim that a district experiences legally significant polarization than are the results of a single election. *Id*.

Dr. Lichtman also did an analysis of the 1993 election results for two precincts inside of Ward 7, a majority African American ward. One of the candidates for Ward 7 city council member was a black Democrat and the other candidate was a white Republican. While Lichtman

7

was unable to perform an ecological regression on the precincts because the ward was not large enough to provide enough data points, he noted that the pattern was illustrative in making a determination regarding voting cohesion. Precinct 12 of Ward 7 had a 77% African American population. In that precinct, the black Democrat received 80% of the vote while the white Republican received 20% of the vote. Precinct 13 of Ward 7 had a 36% African American population. In Precinct 13, the black Democrat received 15% or the vote while the white Republican received 85% of the vote.

Dr. Lichtman's supplemental report analyzed ten exogenous county or state elections in which there was at least one African American candidate. In all but two out of ten elections from the years 1995 through 2003 did African American voters support African American candidates at a level of 69% or higher. In only one out of the ten elections did non-black voters vote for an African American candidate at a percentage higher than 30%. The African American candidate for state treasurer in 2003 received 59% of the non-black vote in the Democratic primary. In total, Dr. Lichtman's primary and supplemental reports supported a finding of racially polarized voting.

Defense expert Ron Weber used adjusted estimate analysis based on sign-in data of the endogenous 1997, 2001, and 2005 general elections for the at large city council seat in the city of Tupelo. The 1997 King methodology results demonstrated that African American voters engaged in single shot voting in favor of candidate Penson. African Americans cast an average of 1.22 votes while non-black voters cast an average of 1.60 votes. The results for the 2001 at large city council seat indicated that African Americans again engaged in single shot voting in favor of candidate Penson, but to a slightly lesser degree. African American voters cast an

8

average of 1.30 votes while non-black voters cast an average of 1.78 votes. Dr. Weber attributed the difference to the fact that there were two Democratic candidates in the race. The 2005 results differed from the preference found in Dr. Lichtman's analysis and showed that the majority of African American support went to candidate Deas, with candidates Neely and Johnson following close behind. African American voters cast 1.48 votes as compared to non-black voters who cast 1.80 votes.

In his supplemental report, Dr. Weber also used the King methodology to analyze the exogenous 1990, 1994, and 1998 Circuit Court Judge elections for District 1, as these elections were the only exogenous elections in which all candidates ran for three open positions and single shot voting could be employed, making the elections more comparable to the at-large system in the city of Tupelo. The 1990 election was a five candidate Democratic primary in which three candidates could be elected. The incumbent, Judge Gardner, received 11.6% of the vote from the African American community and was the African American candidate of choice. The second choice was candidate Russell with 4.1% of the African American vote and the third candidate of choice was African American candidate Barry Ford who received 3.7% of the vote. In this election, African American voters were cohesive even though they were not cohesive in support of the African American candidate. The candidate of choice of non-black voters was candidate Russell, who received 10.3% of the vote. The second choice was candidate Gardner, who received 9.7% of the vote, and the third choice was candidate Ford, who received 5.9% of the vote.

Candidate Ford and candidate Parker both advanced to a run-off election in 1990. Ford was the candidate of choice of both communities. He received 59.4% of the African American

9

vote and 61.3% of the non-black vote, a substantial amount of crossover support. After winning the run-off election, Ford advanced to the general election with the other two Democratic candidates and one Republican candidate. Dr. Weber's results for the general election showed an anomolous result, that candidate Ford was the least favored candidate among African American voters, with the candidates Gardner, Russell and Republican candidate Lawson receiving more support from the African American community. The non-black voters most favored Ford, with Democratic candidates Gardner and Russell favored second and third and Republican candidate Lawson fourth.

In the 1994 election, Dr. Weber was unable to assess cohesion in this election because he did not have sufficient information on voter turnout. The 1994 election involved the three, now incumbent, Democratic judges from the 1990 election and a Republican candidate, Wilbanks. His results showed that the African American voters preferred Gardner (25.4%), Ford (21.2%), Russell (17.8%), and Wilbanks (2.5%). Non-black voters preferred Gardner (18.2%), Russell (14.3%), Ford (14.0), and Wilbanks (4.5%).

The 1998 election also had four candidates, the three incumbent judges and a Republican challenger, Barton. While explaining the results, Dr. Weber stated that African American voters preferred candidate Ford (12.1%), demonstrating cohesive support. Mr. Gardner received 6.3% of African American votes and candidates Barton and Russell both received 0.7% of the African American vote. While African Americans voters demonstrated some measure of cohesiveness in these elections, the white majority did not bloc vote to defeat the minority candidate of choice in any of these elections.

Despite the lack of racial polarization in the judicial elections examined by Dr. Weber, the evidence submitted by both the plaintiffs and defendants supports a determination that racially polarized voting occurs within the city of Tupelo with recognizable regularity. In *Gingles*, the Supreme Court stated that "in a district where elections are shown usually to be polarized, the fact that racially polarized voting is not present in one or a few individual elections does not negate the conclusion that the district experiences legally significant bloc voting." *Gingles*, 478 U.S. at 56. Therefore, the plaintiffs have carried the burden of demonstrating the existence of the second and third *Gingles* preconditions.

**Totality of the Circumstances**

In considering the totality of the circumstances the most important factors bearing on §2 challenges are the "extent to which minority group members have been elected to public office in the jurisdiction" and the "extent to which voting in the elections of the state and/or political subdivision is racially polarized." *Id*. at 51, n. 15. "If present, the other factors, such as the lingering effects of past discrimination, the use of appeals to racial bias in election campaigns, and the use of electoral devices which enhance the dilutive effects of the multimember districts when substantial white bloc voting exists — for example antibullet voting laws and majority vote requirements, are supportive of, but *not essential to*, a minority voter's claim." *Id*. (emphasis in original).

The defendants contend that the true cause for racially polarized voting actually has less to do with racial bias and more to do with partisanship. The defendants assert that African

American voters in the city of Tupelo tend to vote for Democratic candidates while white voters in the city of Tupelo tend to vote for Republican candidates.

The defendants put on testimony from at large council member Carolyn Mauldin, a Republican, who stated that after 1989 many white citizens of Tupelo began joining the Republican party. Councilwoman Mauldin testified that most whites in the city of Tupelo are Republicans and most African Americans in the city are Democrats. She also stated that white Democrats who run for the at large city council seat are often not successful in their campaigns, although in contravention of her point about Republicanism being the key to success she noted that an African American Republican candidate for mayor was unsuccessful in his campaign. Also supporting the defendants' position, at large councilwoman Doyce Deas ran as an independent even though she is a registered Democrat because, as she testified, she felt that she had a better opportunity to win election as an independent.

Despite the argument of the defense, *Gingles* analysis requires that the court find this argument irrelevant in determining a §2 violation. The Supreme Court rejected the argument that ". . . racially polarized voting refers to voting patterns that are in some way *caused by race*, rather than to voting patterns that are merely *correlated with the race of the voter*. . ." *Id*. at 63 (emphasis in original). The reasons that black and white voters vote differently have no relevance to the central inquiry of §2, but the correlation between the race of the voter and the selection of certain candidates is crucial to that inquiry. *Id*. As the plaintiffs have shown a correlation between race and candidate choice, the court now considers the other factors in the 'totality of the circumstances' analysis.

Prior to 1965, Mississippi and its political subdivisions used poll taxes, literacy tests, and citizenship and morality tests as prerequisites to voter registration.  After passage of the Voting Rights Act in 1965, the State of Mississippi and its political subdivisions – including Tupelo, discontinued use of these prerequisites to voter registration.  While the court acknowledges that official discrimination historically has hindered potential minority voters in Mississippi, the plaintiffs did not indicate that the city of Tupelo has currently, or has in the recent past, inhibited access to voting.

Other relevant factors to determine vote dilution in the instant case are the existing voting practices, procedures, or other mechanisms which may enhance the opportunity for discrimination against a minority group.   The city of Tupelo does not employ anti-single shot voting provisions, but it does employ at-large council seats and majority vote primaries pursuant to Miss. Code Ann. 23-15-305.  While at large voting schemes and majority vote primaries are not *per se* violative of §2, these types of devices can be used to subordinate minority votes.  Majority vote primaries reduce the chance that a minority candidate will advance to a general election.  Their use is relevant in examining the totality of the circumstances in the City of Tupelo's voting practices.

The plaintiffs also presented evidence on socioeconomic factors which affect minority participation in the political process.  Dr. Lichtman analyzed the housing, education, income, and poverty levels of African Americans and white citizens in the city of Tupelo.  Using data from the United States 2000 census, Dr. Lichtman's analysis shows that 34.7% of African American households in Tupelo have an income above $35,000 while 61.8% of white households have an income of $35,000 or higher.  27.4% of African American families live at or below the poverty

13

rate as compared to 6.4% or white families. The unemployment rate for African Americans is 11%. For whites, it is 2.4%. Dr. Lichtman testified that these differences are substantial, even in terms of national averages.

The educational rates for African American and white citizens in Tupelo also vary. 64.6% of African Americans aged 25 or older are high school graduates. 86.7% of whites aged 25 or older have graduated high school. 10.5% of African Americans above the age of 25 have attained a bachelor's degree as compared to 31.8% of whites.

37.6% of African Americans own the homes they occupy in the city of Tupelo and 70.9% of whites own the homes they occupy. 19.7% of African Americans live without use of a vehicle while only 4.7% of whites live without use of a vehicle. The median home value for African Americans is $66,300 and the median home value for whites is $97,100. For those who pay rent, the median amount that African Americans pay in rent is $398 per month and the median amount for whites is $495 per month.

The implications of such disparities relate to the ability of African Americans to effectively participate in the political process. Voter registration is vital to participation in the political process; however, the evidence submitted on voter registration rates in the city of Tupelo cause this court concern that the data may not be accurate due to irregular purging of the voter rolls. As such, this court will consider other factors presented related to economic disparities. For instance, people with lower income levels often are unable to contribute financially to the campaign of a candidate. The candidate of choice of communities with lower income levels may have abundant moral support from that community, but members of the

14

community may not have the resources to financially support the candidate in a manner reflective of that support.

Voter turnout is also affected by socioeconomic status. On election day, those without vehicles will have much greater difficulty getting to the polls on election day, if they are able to reach the polls at all. Voter turnout disparities are reflected in the reports of both experts. Dr. Lichtman provided a range of potential turnout for voters for the at large council position during the general elections held in 1993, 1997, 2001, and 2005. Dr. Weber provided voter turnout for the municipal general elections held in 1997, 2001, and 2005. Dr. Lichtman's ecological regression analysis showed that in the 1993 election African American voter turnout ranged from 18.6% to 22.5%. White voter turnout ranged from 33.4% to 66.8%. Dr. Weber did not provide data for 1993. Dr. Lichtman's 1997 analysis showed both a minimum and maximum range of African American voter turnout at 21.9%. White voter turnout was 30.6% to 61.1%. Dr. Weber's ecological inference results reported that 21.6% of African Americans participated in 1997 while 38.1% of whites participated in the election. In 2001, Dr. Lichtman reported an African American minimum and maximum of 10.6% and a white turnout range of 20% to 40%. Dr. Weber reported African American participation at 16.5% and white participation at 20.7%. For the year 2005, Dr. Lichtman found that African American voter turnout ranged from 11.2% to 22.3% and white voter turnout ranged from 18.6% to 37.2%. Dr. Weber reported African American voter turnout at 17% and white voter turnout at 20.2%. Although each report used different scientific methods, the results did not differ greatly and both consistently showed that African American turnout rates are slightly lower than white turnout rates.

Another factor to consider is responsiveness of elected officials to the needs and concerns of a minority group. The defendants remonstrate the creation of a bi-racial committee, later called the multiracial committee, designed to address the needs of minority citizens in Tupelo. In particular, the minority community has brought issues concerning fair hiring and promotion within the city government and school district to the council's attention as well as the issue regarding at large city council positions. The court lauds these endeavors and hopes that these committees prove effective. However, the fact that the newly reformed multi-racial committee was established only two weeks prior to trial detracts from the city's showing of responsiveness.

Factors not considered in this case are the candidate slating process, place requirement, racial appeals during political campaigns, and tenuousness of the policy behind the city's use of at-large city council seats. No evidence was presented at trial on these factors. They are not at issue in the instant matter.

The defendant vigorously denies intentional violation of statutory or constitutional rights. Intent is not at issue in this case. This case is about correlation, and not about why. The recent election history of the city of Tupelo and an examination of the totality of the circumstances factors in this case leads this court to conclude that use of the at-large voting scheme in Tupelo violates §2 of the Voting Rights Act. The plaintiffs have shown African American political cohesion and racial bloc voting. It is undisputed that the city utilizes majority vote primaries and at-large city council seats, and that no African American has been elected to the at-large city council position. The plaintiffs have also provided evidence that African Americans as a whole suffer economic and educational disparities as compared to white citizens within the city of Tupelo. The factor that slightly weighed in the city's favor, responsiveness to the needs of the

16

minority community, fails to rebut evidence of a §2 violation. *Gunn v. Chickasaw County*, 705 F. Supp. 315, 322 (N.D. Miss. 1989) (quoting *Jones v. City of Lubbock*, 727 F.2d 364, 382 (5th Cir. 1984), which noted the diminished role of responsiveness under the results test).

**Remedy**

While the plaintiffs have submitted potential redistricting plans to this court for the purpose of meeting the *Gingles* preconditions, any redistricting plan must be submitted for preclearance by the office of the US Attorney General or the United States District Court for the District of Columbia before it can be implemented. *Gunn*, 705 F.Supp. at 322. Judicial jurisdiction to preclear a plan resides solely in the District Court for the District of Columbia, but this court has jurisdiction to order an interim plan if necessary. *Id*. At this juncture, it does not appear that an interim plan is necessary. The parties are hereby ordered to collaborate in creating either a seven single-member or nine single-member ward plan to submit for preclearance. The court will be in contact with the parties to discuss the time schedule in which the proposed redistricting plan will be completed.

This the 23rd day of January, 2007.

                                                      **/s/ Michael P. Mills**
                                                    **UNITED STATES DISTRICT JUDGE**